UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JACQUELINE STEVENS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13 C 3382 |
| v. | ) | |
| | ) | Chief Judge Rubén Castillo |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL DECLARATION OF JACQUELINE STEVENS, Ph.D.**

Pursuant to 28 U.S.C. § 1746, I hereby declare that the following statements are true and correct to the best of my knowledge and understanding:

1. My true and correct name is Jacqueline Stevens. I am an adult of sound mind and body, and am in all respects competent to make the statements contained herein.

2. I have carefully all records provided by DHS-OIG and ICE in response to my FOIA request of March 20, 2013. Except where otherwise indicated, the factual statements in the paragraphs that follow are all based on specific documents produced to date by DHS-OIG and/or ICE.

3. In analyzing the records DHS-OIG and ICE have disclosed to date, the vast majority of which the agency originally withheld or claimed did not exist, four things became clear. *First*, ICE officers and supervisors within the Bloomington, MN office offered at least two different, conflicting narratives about what happened to the $1200.00 that Ms. Edwards alleges was stolen from her. *Second*, the OIG team assigned to criminally investigate these conflicting narratives did not acknowledge or reconcile them before finding Ms. Edwards' allegation to be unsubstantiated and closing the case. *Third*, there were significant irregularities in the OIG Chicago field office investigators' receipt, reporting, and handling of evidence that would specifically and conclusively resolve the conflict between ICE agents' different stories about what happened to Ms. Edwards' money. And *fourth*, it is precisely the records that DHS-OIG has failed to adequately search for and fully disclose that would allow the public to fairly assess whether OIG's mishandling of this investigation was a purposeful cover-up of criminal activity or mere incompetence on the part of OIG's investigators.

**Conflicting Narratives: Money in the Property Bag or Money in the Sock?**

4. According the ICE Deportation Officer who took Ms. Edwards to the Minneapolis-St. Paul (MSP) Airport on February 8, 2011, and had her withdraw money for a flight she was not required to pay for. This officer placed an envelope containing $1200.00 in into Ms. Edwards' property bag while they were at the airport. Ms. Edwards was holding the bag. The Deportation Officer then brought Ms. Edwards back to the ICE Enforcement and Removal Office (ERO) detention facility in Bloomington, MN, whereupon he placed the personal property in or near the duty desk. Ms. Edwards was placed with some paperwork into a detention cell, where she waited for approximately two hours. She was not given access to the property bag again until ICE Immigration Enforcement Agents removed her from her cell and transported her to MSP to execute her expedited removal order at approximately 2:00 PM. Thus, according to the last ICE official who admits seeing Ms. Edwards' $1200.00 in cash, her envelope was in her property bag while she was in a detention cell.

5. On the other hand, according to virtually every other ICE official OIG interviewed, including the Field Office Director and the Deputy Field Office Director responsible for the Bloomington ERO detention center, cash currency was to remain with the noncitizen in the detention cell, rather than being booked in as part of the person's property. To a person, they conjectured that the cash "would have gone" with the detainee. That assumption, in turn allowed both the OIG investigator and the rest of the ICE officials who were present the day of the incident to conclude that Ms. Edwards had placed the envelope with the money in her sock. This tacit discrediting of Ms. Edwards' story featured prominently in the Report of Investigation.

**OIG's Failure to Reconcile the Sock Theory with the Property Bag Statement**

6. There are at least three rather stubborn problems with the sock theory: First, it would flatly contradict the testimony of the last ICE official who admits to having seen the money – the envelope was in the property bag, which Ms. Edwards didn't have access to when ICE officials say she began talking about money in her sock. Second, it would not conclusively explain where the envelope containing $1200 went. This is because all parties acknowledge that Ms. Edwards made *two* transactions at the US Bank branch in the MSP airport on the morning of February 8, 2011 – one for $1200 and another for $40. Even if Ms. Edwards had an envelope with money in her sock, it does not explain how that envelope came to be the same one as the $1200 envelope that was supposedly in her property bag at the same time.

**Serious Irregularities in OIG's Handling of Crucial Evidence and Agency Records**

7. Perhaps the simplest way to resolve the potential conflict between these stories and the question of what happened to the envelope containing $1200 of Ms. Edwards' money would be to do what Major League Baseball umpires have recently grown accustomed to doing: Check out the replay. After all, video evidence could be a crucial part of this criminal investigation into violations of 18 U.S.C. § 654 (Conversion of Property by Federal Officers or employees) by federal immigration officials. Unfortunately, OIG's handling of potentially dispositive video evidence of criminal wrongdoing was demonstrably lacking during both its investigation and in response to my FOIA request.

8.      The first serious breakdown in OIG's handling of video evidence appears to have occurred almost as soon as the evidence was received. The DHS-OIG Special Agents' Handbook requires agents to complete a memorandum of activity (MOA) for a review of records and submit it to a supervisor for approval within five working days and maintain the memorandum in the investigative case file. *See* ECF No. 24-1 *United States v. Pedraza*, Docket Entry 1, Indictment at ¶ 8, No. 1:13-cr-305 (S.D. Tex. Apr. 9, 2014). Special Agent Guzman apparently received video from SPM, the ICE Bloomington Office, and U.S. Bank as early as May 2011. He reviewed at least part of the video of Ms. Edwards inside the detention cell in ICE's Bloomington facility on August 5, 2011. ("10-4. I'm reviewing the video right now, it should tell us which one was in the cell with her . . . SA [redacted] DHS-OIG."). Yet he did not create an MOA for this video footage until after interviewing all of the ICE agents. Indeed, it took OIG over a year after receiving the ICE video before actually creating an MOA describing its contents, dated May 30, 2012.

9.      Similarly, the US Bank video was received at some undisclosed time in May 2011. But OIG did not create any record of reviewing it until March 13, 2012, again, in violation of the rules that govern OIG criminal investigations, and again after interviewing all ICE agents to obtain their stories first. This extended delay may explain why the agency did not notice when the MOA was prepared and signed off on that no subpoena had actually been issued to US Bank, thus prompting Special Agent in Charge Armando Lopez to change MOA 18 and create a new MOA 24 explaining why the old records were inaccurate. Second Kuehn Decl. ¶ 30.

10.     As with the video from ICE and US Bank, OIG failed to create any memorandum of activity confirming that it had received and reviewed video from the airport until May 30, 2012.

**The DHS-OIG Field Office's Serial Underproductions and Missing Documents**

11.     The Chicago Field Office of DHS OIG Investigations that created and maintained many of the records responsive to my request has now stated four times that searched for and disclosed everything, only to be proven wrong by subsequent searches. Second Kuehn Declaration, ¶¶ 32, 34, 36, 38-39. Worse still is the apparent disappearance from that office of potentially material evidence that would shed light on which of the two narratives ICE agents put forward is true. Specifically, OIG received via email a message stating, "I am sending you a security video of EDWARDS' activity in the airport. . . I am including a breakdown of the different camera views and time stamps of when she enters on each camera. I am sending the package to you today, with all requested materials." Not only did the agency not timely create an MOA describing receipt of this package, but the agency now claims this record – provided as evidence in a federal criminal investigation – cannot be located.

12.     In light of these demonstrable departures from OIG investigatory protocols, the demonstrably missing documents, and the Chicago Field Office's demonstrable inability to conduct an adequate search on four different occasions, it is simply not possible to be confident that additional, earlier, and potentially contradictory drafts of memoranda of activity are not lurking somewhere in the files of that office. Accordingly, I will continue to pursue those records.

3

## **VERIFICATION**

      Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 14th Day of July, 2014.

_____
Professor Jacqueline Stevens